# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Lisa Rouse, Juston Rouse, Jenna Drouin, Nicholas Drouin, Kendra Graybeal, Nichole Edwards, Lucas Edwards, Robert Calamita, Gina Calamita, Nicole Robb, Dave Robb, Clay Whitenack, Andrea Lee Hill Whitenack, Brian Andree, Alexandra Andree, Kyle Witczak, Brittany Witczak, Kristina De Broux, Mary Jane Gougar, and Chris Lorbecki, individually and on behalf of all others similarly situated,

    Plaintiffs,

      v.

H.B. Fuller Company and H.B. Fuller Construction Products Inc.,

    Defendants.

Case No. 0:22-cv-02173-JMB/JFD

**DEFENDANTS'
MEMORANDUM IN SUPPORT
OF THE MOTION TO DENY
CLASS CERTIFICATION**

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTS RELEVANT TO CLASS CERTIFICATION ............................................. 3

      A. H.B. Fuller's Power Grout. ............................................................................. 3

           1.  Power Grout performance. ....................................................................... 3

           2.  H.B. Fuller's marketing of Power Grout. ................................................. 5

           3.  The Power Grout Warranty and the Hardener. ......................................... 6

      B. Plaintiffs' Individual Experiences with Power Grout and the Hardener. .............. 8

           1.  Plaintiffs considered different information before choosing Power
               Grout (if they chose it at all). ................................................................. 9

           2.  Plaintiffs relied on different sources (if any) for their information. .............. 10

           3.  Plaintiffs claim different results with Power Grout. ................................. 10

           4.  Plaintiffs' alleged issues have different potential causes. ............................ 11

           5.  Plaintiffs addressed their alleged issues differently. .................................. 12

III.  LEGAL STANDARD FOR CLASS CERTIFICATION ....................................... 13

IV.   ARGUMENT ....................................................................................................... 14

      A. Plaintiffs' Proposed Class Fails Because It Would Include Individuals Without
         Standing. ......................................................................................................... 14

           1.  Most Power Grout users have no injury. ................................................. 16

           2.  The    proposed    class    contains    individuals    who    are    not
               injured by the Hardener.…………………………………………………......17

      B. Individualized Factual and Legal Issues Predominate. ....................................... 18

           1.  Individualized fact questions predominate. ............................................. 19

           2.  Individualized legal issues also predominate. .......................................... 27

      C. Plaintiffs Are Atypical. ...................................................................................... 33

      D. Plaintiffs Cannot Establish Superiority. ............................................................ 34

      E. Plaintiffs Cannot Certify a Class Under Rule 23(b)(2). ..................................... 36

V.    CONCLUSION ..................................................................................................... 37

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Amos v. Geico Corp.*,
    2008 WL 4425370 (D. Minn. Sept. 24, 2008) ............................................................ 36

*In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*,
    2017 WL 2540822 (N.D. Ga. Jun. 9, 2017)................................................................. 31

*Avritt v. Reliastar Life Ins.*,
    2009 WL 455808 (D. Minn. Feb. 23, 2009) ................................................................ 36

*Avritt v. Reliastar Life Ins.*,
    615 F.3d 1023 (8th Cir. 2010) ..................................................................................... 2

*In re Baycol Prods. Litig.*,
    593 F.3d 716 (8th Cir. 2010) ....................................................................... 14, 30, 34

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ..................................................................................... 14

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) .............................................................................. 28, 30

*Briehl v. Gen. Motors Corp.*,
    172 F.3d 623 (8th Cir. 1999) ..................................................................................... 23

*Carpenter v. PetSmart, Inc.*,
    441 F. Supp. 3d 1028 (S.D. Cal. 2020)...................................................................... 28

*Cole v. Gen. Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007) ..................................................................................... 29

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...................................................................................................... 14

*Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*,
    138 F.3d 351 (8th Cir. 1998) ..................................................................................... 37

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*,
    984 F.3d 595 (8th Cir. 2020) (en banc) .................................................................... 34

*Daigle v. Ford Motor Co.*,
2012 WL 3113854 (D. Minn. July 31, 2012) ...................................................... 26, 35

*Donelson v. Ameriprise Fin. Servs., Inc.*,
999 F.3d 1080 (8th Cir. 2021) ................................................................................ 36

*Ebert v. Gen. Mills, Inc.*,
823 F.3d 472 (8th Cir. 2016) ..................................................................... 2, 14, 18

*Ford v. TD Ameritrade Holding Corp.*,
115 F.4th 854 (8th Cir. 2024) ................................................................................ 18

*Forsher v. J.M. Smucker Co.*,
612 F. Supp. 3d 714 (N.D. Ohio 2020) .................................................................. 30

*In re GenesisIntermedia, Inc. Sec. Litig.*,
232 F.R.D. 321 (D. Minn. 2005) ............................................................................ 33

*Grovatt v. St. Jude Med., Inc.*,
425 F.3d 1116 (8th Cir. 2005) ............................................................................... 36

*Grovatt v. St. Jude Med., Inc.*,
522 F.3d 836 (8th Cir. 2008) ..................................................................... 20, 21, 30

*Hale v. Emerson Elec. Co.*,
942 F.3d 401 (8th Cir. 2019) ................................................................................. 28

*Haley v. Medtronic, Inc.*,
169 F.R.D. 643 (C.D. Cal. 1996) ........................................................................... 32

*In re Hardieplank Fiber Cement Siding Litig.*,
2018 WL 262826 (D. Minn. Jan. 2, 2018) ........................................................ *passim*

*Harris v. Medtronic Inc.*,
2024 WL 1747385 (D. Minn. Apr. 3, 2024) ........................................................... 15

*Hudock v. LG Electronics U.S.A., Inc.*,
12 F.4th 773 (8th Cir. 2021) .................................................................................. 21

*Hummel v. Tamko Bldg. Prods., Inc.*,
303 F. Supp. 3d 1288 (M.D. Fla. 2017) ................................................................. 32

*Ilhardt v. A.O. Smith Corp.*,
168 F.R.D. 613 (S.D. Ohio 1996) .......................................................................... 32

*Insulate SB, Inc. v. Adv. Finishing Sys., Inc.*,
  2014 WL 943224 (D. Minn. Mar. 11, 2014) ....................................................... 27, 28

*Johannessohn v. Polaris Indus., Inc.*,
  450 F. Supp. 3d 931 (D. Minn. 2020) .................................................................... 29, 33

*Johannessohn v. Polaris Indus., Inc.*,
  9 F.4th 981 (8th Cir. 2021) ...................................................................................*passim*

*Lab. Corp. of Am. v. Davis*,
  2025 WL 288305 (U.S. Jan. 24, 2025) ........................................................................ 15

*Lewis v. Casey*,
  518 U.S. 343 (1996) .................................................................................................... 27

*Luiken v. Domino's Pizza, LLC*,
  705 F.3d 370 (8th Cir. 2013) ................................................................................ 14, 18

*Melnick v. TAMKO Bldg. Prods. LLC*,
  347 F.R.D. 79 (D. Kan. 2024) ..................................................................................... 24

*In re Milk Prod. Antitrust Litig.*,
  195 F.3d 430 (8th Cir. 1999) ...................................................................................... 33

*Mollicone v. Universal Handicraft, Inc.*,
  2017 WL 440257 (C.D. Cal. Jan. 30, 2017) ................................................................ 28

*Mosley v. EzriCare LLC*,
  2024 WL 1342615 (E.D. Ky. Mar. 29, 2024) .............................................................. 34

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*,
  327 F.R.D. 245 (D. Minn. 2018) ................................................................................. 28

*Norwood v. Raytheon Co.*,
  237 F.R.D. 581 (W.D. Tex. 2006) ............................................................................... 32

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
  208 F.R.D. 625 (W.D. Wash. 2002) ............................................................................ 32

*Raymond v. Miller & Schroeder Municipals, Inc.*,
  1983 WL 1419 (D. Minn. Jun. 29, 1983) .................................................................... 30

*Richardson v. Bledsoe*,
  829 F.3d 273 (3d Cir. 2016) ........................................................................................ 14

*Rouse v. H.B. Fuller Co.*,
    694 F. Supp. 3d 1149 (D. Minn. 2023) ................................................................. 27, 30

*Runyon v. Bostik, Inc.*,
    2017 WL 5988019 (C.D. Cal. Mar. 28, 2017) ..................................................... 19, 35

*Sacred Heart Health Sys. v. Humana Mil. Healthcare Servs.*,
    601 F.3d 1159 (11th Cir. 2010) ................................................................................ 29

*Shoots v. iQor Holdings U.S. Inc.*,
    325 F.R.D. 253 (D. Minn. 2018) .......................................................................... 29, 35

*In re Terazosin Hydrochloride Antitrust Litig.*,
    160 F. Supp. 2d 1365 (S.D. Fla. 2001) ..................................................................... 28

*Transp. Corp. of Am. v. Int'l Bus. Machines Corp.*,
    30 F.3d 953 (8th Cir. 1994) ...................................................................................... 31

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .................................................................................................. 14

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) .................................................................................... 14

*Vogt v. Progressive Cas. Ins.*,
    129 F.4th 1071 (8th Cir. 2025) ................................................................................ 21

*Webb v. Exxon Mobil Corp.*,
    856 F.3d 1150 (8th Cir. 2017) .................................................................................. 28

## Other Authorities

Federal Rule of Civil Procedure 23 ........................................................................... *passim*

# I.    INTRODUCTION

Plaintiffs' claims over H.B. Fuller's Power Grout are disparate and cannot be certified. Most Power Grout users never experienced a problem with the product, which has sold millions of bags over more than a decade. Yet Plaintiffs generically allege that Power Grout "does not work" and want to bring varying state-law claims on behalf of "all persons" who either bought Power Grout or owned a "structure" with Power Grout installed. (Pls.' Third Am. Compl. ("TAC") ¶ 488.)[1] No such class can be certified, because most putative class members lack standing, and individualized issues predominate.

Plaintiffs' claims are a muddle of individualized experiences that cannot be tried as a class action. Their stories differ at each step: who selected Power Grout and why; what representation (if any) each Plaintiff saw and relied on in choosing Power Grout; who installed the Power Grout; whether it was properly mixed and installed, and where; what issues (if any) allegedly manifested; what caused those perceived issues; how Plaintiffs addressed the issues, including if they used a Hardener or whether they pursued relief through H.B. Fuller's limited warranty. Plaintiffs also plead different state-law claims that would be a nightmare to try together.

---

[1] Plaintiffs seek to certify a nationwide class defined as:

> All persons in the United States and its territories who, within the applicable statute of limitations, either (a) purchased Power Grout or (b) own a structure in which Power Grout was installed. The proposed class includes all such persons or entities who contacted Defendants about their Power Grout, were provided the Hardener, and/or denied or partially denied warranty coverage.

(TAC ¶ 488.)

1

With fact discovery mostly done, now is the time for the Court to deny class certification, as what little remains in discovery cannot change the **four** key reasons precluding certification.

**First**, certification should be denied for lack of standing. A "class cannot be certified if it contains members who lack standing." *Johannessohn v. Polaris Indus., Inc.*, 9 F.4th 981, 987 (8th Cir. 2021).[2] Plaintiffs cannot show that all—or even most—of the putative class members were injured by Power Grout, so Article III standing is lacking.

**Second**, Plaintiffs cannot prove predominance—that H.B. Fuller's "liability to all plaintiffs may be established with common evidence." *Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1029 (8th Cir. 2010). Plaintiffs' claims are not "susceptible to generalized, class-wide proof," because they require property-by-property and project-by-project assessments. *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. 2016). Typicality under Rule 23(a)(3) is likewise lacking because Plaintiffs "were exposed to different representations and, often, were not exposed to the alleged misrepresentations . . . at all." *In re Hardieplank Fiber Cement Siding Litig.*, 2018 WL 262826, at *13 (D. Minn. Jan. 2, 2018).

**Third**, class litigation is not a superior method to resolve Plaintiffs' claims. This is not a "negative-value suit." Far from it, Plaintiffs each seek tens or hundreds of thousands of dollars in damages. Class litigation would also require the Court to apply various states'

---

[2] Unless noted, internal quotations, citations, and alterations are omitted.

laws to multiple products and product versions, and to craft jury instructions for 51 jurisdictions, an unwieldy and unmanageable task.

**Finally**, Plaintiffs' fallback injunctive-relief class also fails because they primarily seek monetary relief and have no plausible risk of future harm.

## II.    FACTS RELEVANT TO CLASS CERTIFICATION

### A.    H.B. Fuller's Power Grout.

#### 1.    Power Grout performance.

H.B. Fuller[3] developed Power Grout in 2011 to answer market demand for improved grout. (*See* Traci Jensen Decl. ¶¶ 4–5.)[4] Compared with traditional grout, Power Grout is more resistant to stains and "efflorescence" (powdery surface-level salt deposits), installs more easily, and cures faster, while providing strong, color-consistent joints. (*Id.*; *see also* Ex. 69 (Daniel Welch Decl.) ¶¶ 10–11.) A highly successful product, tile installers have trusted Power Grout time and again for significant projects, including 11,000 square feet of tile in Indiana State University's renovated natatorium in 2020; 40,000 square feet of tile in Arizona State University's Memorial Union renovation in 2021; and 240 new bathrooms in the $10.5 million renovation of the Grand Traverse Resort and Spa in

---

[3] Defendants are H.B. Fuller Company and its wholly owned subsidiary, H.B. Fuller Construction Products Inc., the entity that manufactured and sold Power Grout product until late last year. Defendants are collectively referenced as "H.B. Fuller."

[4] From 2011 to 2018, H.B. Fuller released seven versions of Power Grout. (Jensen Decl. ¶ 6.)

Michigan in late 2022 and early 2023. (Jensen Decl. ¶ 32, Exs. 50–52,[5] and other examples cited.)

Distributors, installers, retailers, and individuals have purchased millions of pounds of Power Grout over the years. (Jensen Decl. ¶ 31; *see also, e.g.*, Ex. 62 (Buddy Billingsley Decl.) ¶¶ 5–6 (Texas contractor installs around 1 million square feet of tile monthly and uses Power Grout almost exclusively).) Professionals choose Power Grout because it is "one of the best," it "performs consistently, is easy to use, and is durable" (Ex. 64 (Jaime Karsky Decl.) ¶ 7), and "its color consistency and its durability" reduce call-backs from customers (Ex. 70 (James Woelfel Decl.) ¶¶ 7–9). Installers applaud the "strength and density that Power Grout offers, the reliability in installation, and, perhaps more importantly, the stain resistance of the grout." (Ex. 69 (Welch Decl.) ¶ 12.)[6]

H.B. Fuller employees have installed Power Grout in their own homes—where they have had no problems with softness, color bleeding, efflorescence, cracking, or anything else—and evaluated its performance when examining customer installations. (Ex. 32 (O. Del Bosque Dep.) 221:18–222:12.)[7] Individual customer reviews mirror those positive experiences:

---

[5] Substantive exhibits are attached to declarations to verify their authenticity. To minimize confusion, H.B. Fuller numbered exhibits continuously, and will cite to documents by their unique number only. An index of exhibits, numbers, and corresponding declarations is being filed contemporaneously.

[6] Other examples of tile installers and construction managers echoing these sentiments are attached to the Jensen Declaration at ¶ 33 and the Gildea Declaration at ¶ 7.

[7] *See* Ex. 36 (G. Kearns Dep.) 199:1–3, 380:22–381:22, 390:7–391:12; Ex. 30 (J. Anderson Dep.) 128:18–133:25, 174:3–6, 264:24–265:1, 266:6–15; Ex. 34 (T. Jensen Dep.) 394:25–396:20, 407:14–411:10; Ex. 39 (S. Strang Dep.) 277:8–16, 312:17–313:14, 318:5–18.

- "I love power grout and use it on every install . . ." (Ex. 55, HBF1228507.)

- "Power Grout is an amazing product and I will be using it on another bathroom and a laundry room this coming year. . . . I am also encouraging my friends and family to use these products." (Ex. 55, HBF0914354 at 55.)

- "Great stuff. So much better than buying the base mix, the color(s) and the grout boost liquid separately. Nothing to go wrong. Use as much or as little as you like. Great stain resistance . . . ." (Ex. 40, Lowe00000225 at Row 11.)

- "Since PowerGrout has come out, it is the ONLY grout I will use if water is to come in contact with the grout. I have yet, in over 300 showers, had a perpendicular to horizontal line crack! … I have yet to have a color issue, I have yet to have a water infiltration issue, the benefits of the final product far outweigh the little extra work needed to apply this grout, which ain't a lot. . . Lastly, I have used this grout in 3 of my own showers. Given I am in the trade, that should say a little something to the faith a person should have in this product." (Ex. 40, Lowe00000225, at 229, Row 53.)

### 2. H.B. Fuller's marketing of Power Grout.

H.B. Fuller marketed Power Grout through different channels: distributors, which sold Power Grout to tile installation companies and professional installers; retailers, which made Power Grout available directly to consumers; and, on a more limited basis, construction contractors, who bought Power Grout directly from H.B. Fuller. (Jensen Decl. ¶ 34.) The information H.B. Fuller provided—*i.e.*, "sell sheets," technical specification sheets, or fliers with varying detail—depended on the channel, the individual distributor or retailer, and the sales representative. (*Id.* ¶¶ 35–40, 42; *see also* Exs. 56–60.) While distributors often rely on specifications and instructions in "sell sheets" (*id.* ¶¶ 37–39), retailers promoted Power Grout through signage and references to Power Grout's website (*id.* ¶ 40). Users were thus exposed to different information depending on how and where they obtained their Power Grout and even what size bag was purchased. (Jensen Decl. ¶

5

41; *see also* Ex. 33 (K. Fritts Dep.) 74–75 (smaller bags of do not mention features larger bags do).)

### 3. The Power Grout Warranty and the Hardener.

All grout is susceptible to user error. Failing to follow manufacturer instructions— like adding too much or not enough water to the grout, improper mixing, or installing the grout under the wrong conditions, in the wrong places, or in the wrong way—can performance issues. (Jensen Decl. ¶ 15; Ex. 69 (Welch Decl.) ¶ 14; Ex. 66 (Justin O'Farrell Decl.) ¶¶ 9–11.)[8] Although H.B. Fuller educated customers on installation techniques, installers often failed to follow instructions, leading to overwatered grout and other problems. (Jensen Decl. ¶¶ 11, 14–17; Ex. 69 (Welch Decl.) ¶¶ 14–15.) In fact, H.B. Fuller has found that most problems result from installer errors. (Jensen Decl. ¶ 14.)

H.B. Fuller still often provided support in those instances. For customers alleging "soft grout" issues, H.B. Fuller provided complimentary grout "Hardener." (Jensen Decl. ¶ 19.) Applying grout hardener is among the National Tile Contractors Association's recommendations for addressing soft grout. (*See* Ex. 61 at HBF0610771.) In most cases, the Hardener resolved customer concerns.[9]

---

[8] *See also* Ex. 38 (G. Schad Dep.) 388:5–389:16; Ex. 32 (O. Del Bosque Dep.) 226:19– 227:15; Ex. 37 (T. Plaskota Dep.) 345:19–346:12; Ex. 31 (M. Bobak Dep.) 32:2–9; Ex. 30 (J. Anderson Dep.) 153:2–154:16.

[9] *See, e.g.*, Jensen Decl. ¶ 20, Ex. 44 (distributor closing claim because "[t]he hardener worked and consumer is happy with it" (HBF0770358); installer stating, "Thanks for sending the grout hardener. It worked great." (HBF1136815); other examples cited.)

H.B. Fuller also offered a limited lifetime warranty ("Limited Warranty") to "the owner of the premises in which the Power Grout is installed." (Ex. 45.) The Limited Warranty covers "substantial manufacturing defects," but excludes problems from improper installation. (*Id.*) As the "exclusive remedy" under the Limited Warranty, H.B. Fuller would "at its option and expense . . . replace the Product or refund the amount Owner paid for the defective Product." (*Id.*)

H.B. Fuller warranty data reflects that most customers never approached H.B. Fuller with any issue. Despite selling millions of bags a year, H.B. Fuller averaged only a few hundred warranty claims annually. (Jensen Decl. ¶¶ 26, 31; Ex. 49.) Claims payments averaged fewer than two percent of Power Grout sales. (*Id.* ¶¶ 27–28.) Claims rose after Version 5 was introduced in 2016, but still remained a tiny fraction of total sales by dollar value. (*Id.* ¶¶ 27–30.)[10] Technical Specialist Glenna Kearns testified about several negative

---

[10] Plaintiffs have tried to build their case around a few negative documents prepared after the release of Version 5. Plaintiffs often point to "hardness" tests and other cherry-picked statements to claim widespread performance issues. There is, however, no industry standard for "hardness" in finished grout installations. (*See* Ex. 30 (J. Anderson Dep.) 173:8–12 ("That's the difficulty here is there is no industry standard around hardness. I think it's a struggle for the industry.").) Second, Plaintiffs' out-of-context statements do not impact the evidence showing widespread successful installations. For example, H.B. Fuller employee Chris Kain clarified that his statement that "if you go looking for [softness issues], you will find it with most Power Grout installations" was a reference to customers' tendencies to "find" issues when motivated: "People that have gone looking for it don't find it with their fingernail or a cloth. One used a dental pick, another one used a screwdriver, and they claim that it's soft grout with a screwdriver . . . that's not a performance of the grout, that's digging a screwdriver into your grout." (Ex. 35 (C. Kain Dep.) 278:18–279:3.) Third, the increase in softness claims after the introduction of Version 5 confirmed that myriad installation variables—*e.g.*, drill mixing, hand mixing, "mixing to feel," overwatering, tile type, joint width, environmental conditions, using partial bags, retailer failure to rotate inventory, failure to properly prepare tile—contributed to performance issues characterized as "softness." If anything, these documents confirm

comments made "when we were in the thick of this in 2017, 2018," that do not reflect performance of Power Grout overall. (Ex. 36 (G. Kearns Dep.) 206:1–2.) As Kearns said, "I also have used it myself and it's not defective. There are hundreds of installations where it is not defective." (*Id.* at 199:2–4.) H.B. Fuller introduced Version 6 in early 2018. (Jensen Decl. ¶ 6.) Since Version 6, claims dropped to their lowest levels. (*Id.* ¶ 30.) After over a decade and millions of bags of Power Grout sold, the "vast majority of customers" never reported any issues. (Ex. 32 (O. Del Bosque Dep.) 223:6–18.)

**B.    Plaintiffs' Individual Experiences with Power Grout and the Hardener.**

Plaintiffs are 20 individuals in 11 households from 10 states who allege that (i) they owned homes with Power Grout installed, and (ii) both Power Grout and the Hardener are defective across the board. Plaintiffs theorize that these products failed for *everyone* who used them, and that *everyone* who used them relied on H.B. Fuller's representations. Plaintiffs claim breach of implied and express warranty, negligence, products liability, and fraud under the laws of all U.S. jurisdictions, along with alleged violations of seven state unfair and deceptive trade practice ("UDAP") statutes.[11] Plaintiffs also want their claims tried together and seek certification under Rules 23(b)(2) and (b)(3) of either a nationwide

---

that failing to follow installation instructions may result in individualized performance issues.

[11] The TAC asserts 17 numbered claims. Sean Mulvey voluntarily dismissed his claims, eliminating Count 14. (*See* ECF No. 244.) The Court later dismissed Counts 8, 9, and 16. (*See* ECF No. 272, at 28.) The TAC also asserts Magnuson-Moss Warranty Act violations, but only on behalf of Plaintiffs individually. (*See* TAC, Count 17.)

class or seven state subclasses. But Plaintiffs' experiences with Power Grout and the Hardener are as disparate as their claims.

### 1. Plaintiffs considered different information before choosing Power Grout (if they chose it at all).

The differences begin with how Power Grout and the Hardener came to be used in Plaintiffs' homes. Of the 11 households, four saw *no representations at all* about Power Grout before it was installed, either because their contractors picked the grout or Power Grout was already installed when they bought their homes.[12] Others saw no representations about the Hardener before it was applied.[13] Only two households confirmed seeing anything from H.B. Fuller before buying Power Grout or having it installed.[14] Those Plaintiffs who learned anything about Power Grout heard various statements, including that Power Grout did not need to be sealed,[15] is "low maintenance,"[16] or is "great for high traffic areas."[17] Plaintiffs also wanted different qualities in their grout. Six households liked the available colors.[18] Seven households wanted a grout that did not need sealing or was water

---

[12] *See* Ex. 1. (Exhibit 1 references Plaintiffs' depositions and discovery responses; Exhibits 2–7 compile references to relevant statutes and case law; Exhibits 8–29 attach Plaintiffs' deposition testimony.)

[13] *See, e.g.*, Ex. 12 (K. De Broux Dep.) 139:2–15.

[14] *See* Ex. 27 (K. Witczak Dep.) 89:5–15; Ex. 24 (A. Whitenack Dep.) 64:9–16.

[15] *See, e.g.*, Ex. 8 (A. Andree Dep.) 259:21–260:11.

[16] Ex. 24 (A. Whitenack Dep.) 17:3–18:9.

[17] Ex. 14 (N. Drouin Dep.) 53:20–54:5.

[18] *See* Ex. 14 (N. Drouin Dep.) 53:6–19; *see also* Ex. 10 (G. Calamita Dep.) 95:6–15; *see also* Ex. 1.

resistant.[19] What information Plaintiffs saw (if any) and considered material differed from person to person.

### 2.    Plaintiffs relied on different sources (if any) for their information.

Each Plaintiff who saw any representation about Power Grout received different information from different sources, including third parties. Kyle Witczak read "good reviews" online, as well as the Power Grout website and the side of the bag.[20] Lucas Edwards researched Power Grout online but could not recall which websites he visited or what information he saw.[21] Gina Calamita was "push[ed]" toward Power Grout by a flooring company employee, who later gave her an "advertisement-type pamphlet," but she was unsure who published it and only recalled that it mimicked what the flooring employee had told her.[22] The Andrees' contractor "convinced" them to use Power Grout, as did five other households that relied on contractor or store recommendations.[23]

### 3.    Plaintiffs claim different results with Power Grout.

Plaintiffs' actual experiences with Power Grout also differed. Five households— almost half—concede having "no issues" with some Power Grout installations.[24] Two

---

[19] *See* Ex. 1.

[20] Ex. 27 (K. Witczak Dep.) 87:7–89:9.

[21] Ex. 15 (L. Edwards Dep.) 79:2–24.

[22] *See* Ex. 10 (G. Calamita Dep.) 95:6–22, 97:17–100:5.

[23] Ex. 9 (B. Andree Dep.) 101:7–20; *see also, e.g.*, Ex. 15 (L. Edwards Dep.) 75:20–76:5; *see also* Ex. 1.

[24] *See* Ex. 27 (K. Witczak Dep.) 217:17–218:2 ("Q. As for [the laundry room and first floor half bath], have you encountered any issues with the grout installed in either of those rooms? A. No."); *see also* Ex. 1.

households internally disagree about which issues they experienced.[25] Other issues vary house-by-house and room-by-room.[26] Some Plaintiffs say Power Grout caused water damage, while others cannot identify water damage.[27] Some Plaintiffs allege pigment bleeding.[28] Only two say their grout has efflorescence.[29] Eight claim their grout did not properly harden,[30] and three claim the grout cracked or shrank.[31]

### 4. Plaintiffs' alleged issues have different potential causes.

Plaintiffs' alleged issues have different potential causes. The Witczaks self-installed their grout,[32] while different contractors installed Power Grout for the other 10 households.[33] Many Plaintiffs do not know whether their contractors followed mixing and installation instructions,[34] while three households *admit* their installers failed to follow

---

[25] *See* Ex. 11 (R. Calamita Dep.) 83:24–84:3 ("But as far as I know, I don't see…an issue with the floor. But, again, my wife knows more on that."); Ex. 21 (N. Robb Dep.) 31:7–9 (noting no issues where water splashes on tile outside the shower), *but see* Ex. 20 (D. Robb Dep.) 44:15–19 (claiming issues in both the shower and on the bathroom floor).

[26] *Id.*; *see also* Ex. 8 (A. Andree Dep.) 204:13–205:7 (claims efflorescence in bathroom grout) and Ex. 9 (B. Andree Dep.) 84:17–85:17 (no efflorescence in laundry and fireplace grout); Ex. 12 (K. De Broux Dep.) 155:6–25 (sees cracked tiles around shower window, but not in kitchen); *see also* Ex. 1.

[27] *See, e.g.*, Ex. 11 (R. Calamita Dep.) 230:10–14 ("Q. Since 2021, have you experienced any water penetration in your home? [Objection.] A. I don't know."); *see also* Ex. 1.

[28] *See, e.g.*, Ex. 10 (G. Calamita Dep.) 71:2–3; *see also* Ex. 1.

[29] *See* Ex. 8 (A. Andree Dep.) 204:13–205:7; Ex. 10 (G. Calamita Dep.) 72:18–22.

[30] *See* Ex. 1.

[31] *Id.*

[32] *See* Ex. 27 (K. Witczak Dep.) 97:8–14.

[33] *See* Ex. 1.

[34] *See, e.g.*, Ex. 22 (J. Rouse Dep.) 53:21–24 ("Q. I'm just asking, you don't have any personal knowledge of whether the contractors mixed the grout correctly or not, right? A. No."); Ex. 12 (K. De Broux Dep.) 138:22–139:1 (does not know whether contractor

mixing instructions.[35] At least two households had pervasive contractor errors throughout their renovation projects, reinforcing that installation error is the most likely explanation for any grout issues.[36]

H.B. Fuller's inspections of Plaintiffs' homes confirmed numerous workmanship errors. The Rouses' contractor forced Power Grout between touching tiles, while the Drouins' contractor filled gaps over double the maximum allowable width.[37] Graybeal had Power Grout inadequately packed into tile joints.[38] Gougar patched the grout with a skim coat of new Power Grout over the old.[39]

### 5. Plaintiffs addressed their alleged issues differently.

Ten households filed warranty claims with H.B. Fuller,[40] although some waited years to do so.[41] H.B. Fuller sent complimentary Hardener to all claimants; two households

---

installed Hardener correctly); *see also* Ex. 1.

[35] *See* Ex. 8 (A. Andree Dep.) 194:20–195:13 ("Did you know that your contractor had not mixed the entire bag? [Objection.] A. No. Q. Does that suggest to you the contractor may have made an error . . . ? [Objection.] A. Yes."); Ex. 18 (K. Graybeal Dep.) 116:3–8; Ex. 12 (K. De Broux Dep.) 91:25–92:3.

[36] *See* Ex. 17 (M. J. Gougar Dep.) 78:18–79:5 ("Q. But there were certain spots that didn't have waterproofing? A. From what he said."); *see also* Exhibit 41 (Plaintiff De Broux complaining about faulty bathroom sink installation, failure to seal around bathtub, faulty shower head, broken floor tiles, etc.).

[37] *See* Decl. of Heather Ruhl ¶¶ 10–11.

[38] *See* Ruhl Decl. ¶ 12.

[39] *See* Ex. 19 (C. Lorbecki Dep.) 43:9–44:6.

[40] *See* Exhibit 1; *see also* Ex. 13 (J. Drouin Dep.) 91:11–15 ("Q. You didn't make a warranty claim prior to [notifying H.B. Fuller of your intent to sue], did you? A. … We did not do a separate claim directly, no.").

[41] *See* Ex. 27 (K. Witczak Dep.) 149:2–25, 182:6–9; Ex. 11 (R. Calamita Dep.) 227:8–11; Ex. 18 (K. Graybeal Dep.) 229:23–230:3; Ex. 16 (N. Edwards Dep.) 20:22–21:3, 105:22–

refused to use it.[42] Some Plaintiffs acknowledged the Hardener fixed issues they had with the grout.[43] H.B. Fuller also reimbursed three households under the Limited Warranty for the cost of repairing their grout.[44]

Some Plaintiffs repurchased Power Grout despite claiming issues. After alleging problems with a 2019 installation, the Edwardses bought more Power Grout and installed it two years later in a kitchen and bathroom renovation.[45] The Whitenacks chose Power Grout both when building their home in 2017 and again in 2022.[46] The Andrees and Graybeal reinstalled Power Grout in their bathrooms because they wanted colors to match.[47]

### III.    LEGAL STANDARD FOR CLASS CERTIFICATION

Rule 23(c)(1)(A) requires class certification to be decided "[a]t an early practicable time," and "[a] defendant may move to deny class certification before a plaintiff files a

---

106:14, 211:14–19.

[42] *See* Ex. 18 (K. Graybeal Dep.) 219:15–220:1; Ex. 8 (A. Andree Dep.) 177:11–13; *see also* Ex. 1.

[43] *See* Ex. 27 (K. Witczak Dep.) 121:24–122:5 (Q. "Would it be fair to say that the hard[ener] has helped address the issue of the color going down the wall? . . . A. Yes. You don't see it—you don't see it, yeah."); Ex. 19 (C. Lorbecki Dep.) 38:3–13 ("You could just see [the grout] smearing across the tile when you'd wash it; but after the hardener, it didn't do that."); Ex. 10 (G. Calamita Dep.) 182:10–19 (Q. "[I]s it fair to say . . . the situation with things running down the walls was better with the hardener applied . . . ? A. It was . . . definitely a little better.").

[44] *See* Ex. 12 (K. De Broux Dep.) 180:4–186:16; Ex. 16 (N. Edwards Dep.) 243:15–22; Ex. 24 (A. Whitenack Dep.) 94:3–95:22.

[45] *See* Ex. 15 (L. Edwards Dep.) 108:11–109:13.

[46] *See* Ex. 25 (C. Whitenack Dep.) 72:2–13, 87:1–7.

[47] *See* Ex. 9 (B. Andree Dep.) 207:5–209:14; Ex. 18 (K. Graybeal Dep.) 120:15–20.

motion to certify a class." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 941 (9th Cir. 2009); *accord Richardson v. Bledsoe*, 829 F.3d 273, 288 (3d Cir. 2016); *In re Baycol Prods. Litig.*, 593 F.3d 716, 720 n. 2 (8th Cir. 2010), *vacated on other grounds* 2011 WL 11747958 (8th Cir. Aug. 4, 2011). The burden, however, remains with Plaintiffs to show "that the class should be certified and that the requirements of Rule 23 are met." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). Plaintiffs "must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *Ebert*, 823 F.3d at 477–78. The Court must conduct a "rigorous analysis" of whether Rule 23(a) and (b) prerequisites have been satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *Cody v. City of St. Louis for & on behalf of Medium Sec. Inst.*, 103 F.4th 523, 531 (8th Cir. 2024).

Class certification decisions are often made before completing full merits discovery. *See Blades v. Monsanto Co.,* 400 F.3d 562, 573–74 (8th Cir. 2005). Fact discovery in this case has continued for over two years, with discovery on Plaintiffs complete and just two fact depositions remaining. The record confirms that no class can be certified.

## IV.    ARGUMENT

### A.    Plaintiffs' Proposed Class Fails Because It Would Include Individuals Without Standing.

"A class cannot be certified if it contains members who lack standing." *Johannessohn*, 9 F.4th 981 at 987; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Every class member must have Article III standing in order to recover individual damages."). In a product-defect case, "it is not enough to allege that a product

line contains a defect or that a product is *at risk* for manifesting the defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." *Johannessohn*, 9 F.4th at 987 (emphasis in original). "It is well-established in this Circuit that because an injury must be particular to the plaintiff, 'purchasers of an allegedly defective product have no legally cognizable claim where the alleged defect has not manifested itself in the product they own.'" *Harris v. Medtronic Inc.*, 2024 WL 1747385, at *3 (D. Minn. Apr. 3, 2024) (Bryan, J.) (quoting *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009)).

*Johannessohn* illustrates this rule. There, the plaintiff sought to certify a nationwide class of all Polaris ATV purchasers, claiming the vehicles suffered an undisclosed heat defect. *See Johannessohn*, 9 F.4th at 987. Affirming the denial of certification, the Eighth Circuit emphasized the "fundamental problem" that "a class cannot be certified if it contains members who lack standing." *Id.* Thus, "[i]f members who lack the ability to bring a suit themselves are included in a class, the court lacks jurisdiction over their claims." *Id.* There, plaintiffs "did not define their class to make sure all proposed [class] members have standing," as "evidence at the class certification stage shows that not all of the ATVs manifested the alleged heat defect," including Polaris employee testimony. *Id.* The court held that "the class has not been defined in such a way that anyone within it would have standing, [and] the class cannot be certified." *Id.* at 988.[48]

---

[48] On January 24, 2025, the U.S. Supreme Court granted certiorari to review "[w]hether a federal court may certify a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) when some members of the proposed class lack any Article III injury." *Lab. Corp. of Am. v. Davis*, 2025 WL 288305, at *1 (U.S. Jan. 24, 2025).

As in *Johannessohn*, Plaintiffs "did not define their class to make sure all proposed members have standing." 9 F.4th at 987. The class includes anyone who bought Power Grout or owns a "structure" with Power Grout, no matter whether the product exhibited a defect. But "it is not enough to allege that a product line contains a defect or that a product is *at risk* for manifesting this defect; rather, the plaintiffs must allege that their product *actually exhibited* the alleged defect." *Id.*

### 1. Most Power Grout users have no injury.

Of tens of millions of pounds sold over a decade, H.B. Fuller received only a few thousand complaints about Power Grout—while evidence of successful installations and uninjured users abounds:

- Plaintiffs admit *no problems* with some Power Grout installations. (*See, e.g.*, Ex. 20 (D. Robb Dep.) 78:2–5, 78:22–79:4, 91:8–23 (admitting no issues with laundry room, kitchen, and shower installations).)

- Current and former H.B. Fuller employees testified to issue-free installations of Power Grout in their own homes. (*See, e.g.*, Ex. 36 (G. Kearns Dep.) 380:22–381:22 ("And now you've had [Power Grout] in your home for two years? A: Yes. Q: And has it exhibited any defects, to your knowledge? A: No. Q: Is it sufficiently hard? A: Yes. Q: Has it exhibited any efflorescence? A: No. Q: Does it have any cracks? A: No.").)

- Customers and installers have left glowing reviews about the product. (*E.g.*, "I love power grout and use it on every install…" (Jensen Decl. ¶ 33.).) One installer

recounted using Power Grout in over 300 shower installations (including three of his own) without incident. (Ex. 40 (Lowe00000225 at 229, Row 53).)

- H.B. Fuller employees tested numerous Power Grout installations and found them performing as they should. (*See, e.g.*, Ex. 32 (O. Del Bosque Dep.) 223:20–224:6; Ex. 37 (T. Plaskota Dep.) 123:19–124:3, 126:11–15, 339:7–343:2.)

- Installers have relied on Power Grout for years.[49] Wisenbaker, a major construction company, has for years used Power Grout almost exclusively on the millions of square feet of tile it installs annually. (Ex. 62 (Billingsley Decl.) ¶ 6.)

In other words, the record establishes that Plaintiffs' proposed class contains numerous Power Grout installations with no manifest defects. Those users have no injury-in-fact and no standing. *See Johannessohn*, 9 F.4th at 987.

### 2. The proposed class contains individuals who are not injured by the Hardener.

These Article III problems are even more apparent with claims about the Hardener. Plaintiffs want to define a class to include owners of any structure with Power Grout installed and bring claims over Power Grout *and* the Hardener. But H.B. Fuller supplied the Hardener only to the small percentage of Power Grout users who complained. (Jensen Decl. ¶ 19.) Most putative class members *never received the Hardener*. Those who

---

[49] *See* Exs. 62–70 (Declarations of Buddy Billingsley (Wisenbaker), Emily Heinze (Northwest Tile Supply), Jaime Karsky (Meadowlark Tile), Tim McAdoo (UCX/JJ Haines), Justin O'Farrell (Commercial Contractors, Inc.), Daniel Welch (Welch Tile & Marble), and James Woelfel (Artcraft) submitted in support of this motion); *see also* Ex. 32 (O. Del Bosque Dep.) 224:11–225:8 (confirming Power Grout was a popular product with installers using it repeatedly: "We had distributors that were selling truckloads of it.").

received it did not always use it,[50] and those who used it often had good results.[51] Gougar and Lorbecki, for example, testified that they sold their house after the Hardener was applied and viewed it as sufficient to resolve any supposed issues.[52] Thus, most putative class members (including some named Plaintiffs) were uninjured by the Hardener, and lack standing. *See Johannessohn*, 9 F.4th at 987.

## B.    Individualized Factual and Legal Issues Predominate.

To certify their proposed class, Plaintiffs must prove that common questions of fact and law "predominate over questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make prima facie showing or the issue is susceptible to generalized, class-wide proof." *Ebert*, 823 F.3d 472 at 479. Predominance "is not satisfied if individual questions overwhelm the questions common to the class." *Id.* at 478–79. The Eighth Circuit rejects "certification of classes where trial would require considering varied circumstances." *Luiken*, 705 F.3d 370 at 374; *accord Ford v. TD Ameritrade Holding Corp.*, 115 F.4th 854, 860 (8th Cir. 2024) (reversing

---

[50] *See* Ex. 18 (K. Graybeal Dep.) 219:15–220:1; Ex. 8 (A. Andree Dep.) 177:11–13.

[51] *See, e.g.*, Jensen Decl. ¶ 20.

[52] *See* Ex. 17 (M. J. Gougar Dep.) 104:3–17 ("Q. Did you disclose to the buyers that you were applying hardener to the floor? A. I told them that they needed to apply the hardener every so often… Q. Did you tell them anything else about the grout in your home? A. Nope, because there was no reason to…").

certification when "plaintiffs' method of proving their claim would include individualized inquiries that cannot be addressed in a manner consistent with Rule 23").

Judge Davis's ruling in *Hardieplank*, denying certification in a very similar case, illustrates why no class can be certified here. 2018 WL 262826, at *2–5. That case concerned fiber-cement home siding, which the manufacturer advertised through various channels, including print, radio, and television, presentations to dealers and builders, as well as "cooperative marketing" with "intermediaries." *Id.* at *4. Eleven plaintiffs from eight states, with varying experiences, alleged that the siding suffered "delamination and coating adhesion problems" that led the product to "fail[] prematurely." *Id.* at *2.

Denying certification, Judge Davis ruled "that common issues do not predominate because [defendant's] liability to all proposed class members cannot be established with common evidence." *Id.* at *15. "Any common issues of law and fact," the court recognized, "will be overwhelmed by a myriad of individualized fact questions and a variety of applicable state laws with material differences." *Id.* at *1; *see also Runyon v. Bostik, Inc.*, 2017 WL 5988019, at *3–4 (C.D. Cal. Mar. 28, 2017) (denying class certification in defective-mortar case because of "myriad factual and legal questions that must be individually determined for each putative class member").

### 1.    Individualized fact questions predominate.

Each consideration in *Hardieplank* applies here.

**Exposure**. "Determining whether a class member was exposed to a particular representation will require individualized fact finding." *Hardieplank*, 2018 WL 262826, at *15. In *Hardieplank*, "[t]he proposed class was exposed to materially different

representations," as some plaintiffs saw nothing about the product before purchasing it, others saw statements from third parties, and others saw representations by defendant. *Id.*; *see also Grovatt v. St. Jude Med., Inc.*, 522 F.3d 836, 838 (8th Cir. 2008) (reversing certification when defendant "presented evidence that a number of [plaintiffs] did not receive *any* material representation about [the product]") (emphasis in original).

Only two of 11 Plaintiff households contend they saw any representations about Power Grout from H.B. Fuller. (*See* Ex. 1.) Four were not exposed to *any* representations at all about Power Grout, from any source, before it was installed in their homes.[53] Similarly, most putative class members, including some named Plaintiffs, never saw *any* representations about the Hardener.[54]

And the seven households that picked Power Grout learned about it from third parties: flooring-store salespeople, contractors, online reviews, and websites they vaguely remember.[55] Plaintiffs also allege exposure to different representations: some claimed to

---

[53] *See* Ex. 17 (M. J. Gougar Dep.) 18:4–19:2 ("I just trusted the contractor to pick the right grout and do the right job."); Ex. 20 (D. Robb Dep.) 35:25–36:8 ("[D]id you have any conversations about grout before it got installed? A: No. Q: Did you do any research about it before it was installed? A: Didn't give grout much thought. Q: So I take it you did not review any material? A: No."); *see also* Ex. 1.

[54] *See, e.g.*, Ex. 12 (K. De Broux Dep.) 139:2–15 (admitting she did not "know anything about the hardener" before it was applied to her grout).

[55] *See e.g.*, Ex. 9 (B. Andree Dep.) 99:8–18, 100:8–101:8 (Appalachian Tradesman "convinced us that it's a better product than, I guess, other grouts."); Ex. 13 (J. Drouin Dep.) 93:7–15 ("Q. [Y]ou testified that you were relying on the representations from Artistic Tile about Power Grout used in your home, correct?…A.…[Y]es, we took their recommendation, after we were satisfied with their answers."); *see also* Ex. 1.

have heard Power Grout did not need sealing,[56] that it was "low maintenance,"[57] that it is

"great for high traffic areas,"[58] or that it is "resistant to mold and mildew."[59]

These different sources of exposure matter. Like the siding in *Hardieplank*, H.B.

Fuller marketed Power Grout through different channels, salespeople, marketing materials,

and even bag-label representations, which differed materially depending on the bag size or

Power Grout version. (Jensen Decl. ¶¶ 34–42.) Detailed, individualized fact-finding would

be necessary just to understand which marketing channel is even at issue, much less what

any individual or their contractor saw.

**Reliance and Materiality**. Proof of reliance and materiality, elements of Plaintiffs'

fraud, negligent misrepresentation, and certain UDAP claims, also defeat predominance.

*Hardieplank*, 2018 WL 262826, at *18 ("individualized questions of reliance" defeated

predominance for statutory and warranty claims). The Eighth Circuit rejects certification

of such claims as "unsuitable for class treatment." *Vogt v. Progressive Cas. Ins.*, 129 F.4th

1071, 1073 (8th Cir. 2025); *see also St. Jude*, 522 F.3d at 838–39 (reversing certification

because some plaintiffs did not recall any representations from defendant or relied on

doctor's recommendation); *Hudock v. LG Electronics U.S.A., Inc.*, 12 F.4th 773, 777 (8th

Cir. 2021) (reversing certification because "[q]uestions of which television features . . .

motivated individual consumers to purchase" created predominant individual issues).

---

[56] *See* Ex. 1.

[57] *See* Ex. 24 (A. Whitenack Dep.) 17:3–18:9.

[58] *See* Ex. 14 (N. Drouin Dep.) 53:20–54:5.

[59] *See* Ex. 27 (K. Witczak Dep.) 87:7–89:9.

As in *Hardieplank*, Plaintiffs chose, bought, and used Power Grout based on different information from different sources. 2018 WL 262826, at *17 (plaintiffs "rely on a variety of statements . . . and many named Plaintiffs testified that they never heard or saw any Hardie advertisement"). De Broux, Graybeal, Gougar, and Lorbecki relied on nothing—they did not even know Power Grout had been installed until after the fact.[60] The Court dismissed De Broux's negligent-misrepresentation and fraud claims for this reason. (*See* ECF No. 272 at 7–8.) The Andrees, Calamitas, Drouins, Edwardses, Rouses, and Whitenacks relied on recommendations from different local tile shops or their contractors.[61] Andrea Whitenack relied on her tile shop's recommendation but also the Power Grout bag.[62] Gina Calamita's tile shop steered her toward Power Grout because she wanted black grout, then gave her a pamphlet that she cannot identify and no longer has.[63] Lisa Rouse "deferred" to her contractors' grout selection.[64] The Witczaks and Edwards researched Power Grout online before buying.[65]

---

[60] *See* Ex. 17 (M. J. Gougar Dep.) 18:4–19:2 ("I just trusted the contractor to pick the right grout and do the right job."); *see also* Ex. 1.

[61] *See, e.g.*, Ex. 11 (R. Calamita Dep.) 103:20–23: ("Q. So it was the Avalon Flooring representative who—who told you about Power Grout? A. Correct."); Ex. 24 (A. Whitenack Dep.) 64:9–16; Ex. 10 (G. Calamita Dep.) 95:6–15, 97:17–99:20; Ex. 23 (L. Rouse Dep.) 90:22–91:6; *see also* Ex. 1.

[62] *See* Ex. 24 (A. Whitenack Dep.) 64:9–16.

[63] *See* Ex. 10 (G. Calamita Dep.) 95:6–15, 97:17–99:20.

[64] *See* Ex. 23 (L. Rouse Dep.) 90:22–91:6.

[65] *See* Ex. 27 (K. Witczak Dep.) 87:7–89:9; Ex. 15 (L. Edwards Dep.) 78:20–81:6.

Plaintiffs also considered different factors to be material. Six households chose Power Grout because they liked the color options.[66] Seven wanted a "low maintenance" grout that did not need sealing.[67] Six relied on contractors' or tile stores' recommendations.[68] The Edwardses bought more Power Grout after their initial experiences.[69] The features Plaintiffs sought and the sources they relied on (if any) varied. *See Hardieplank*, 2018 WL 262826, at *17 (plaintiffs "rely on a variety of statements").

Finally, most putative class members never used the Hardener and could not have relied on any representations about it. Even Plaintiffs who used the Hardener did not rely on information from H.B. Fuller.[70]

**Injury**. As in *Hardieplank*, "[d]etermining whether any putative class member was injured will require a highly individualized inquiry." 2018 WL 262826, at *17. The overwhelming majority of putative class members experienced *no* problems with Power Grout or the Hardener. *See Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("[P]urchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own."). The individualized

---

[66] *See, e.g.*, Ex. 14 (N. Drouin Dep.) 52:14–53:19; Ex. 10 (G. Calamita Dep.) 95:6–15; *see also* Ex. 1.

[67] *See* Ex. 27 (K. Witczak Dep.) 87:13–15; *see also* Ex. 1.

[68] *See* Ex. 23 (L. Rouse Dep.) 80:22–81:4; *see also* Ex. 1.

[69] *See* Ex. 15 (L. Edwards Dep.) 108:11–109:13.

[70] *See* Ex. 12 (K. De Broux Dep.) 139:2–15 (admitting she knew nothing about the Hardener before it was installed).

analysis required to determine who was injured defeats predominance for all claims because injury is an essential element of each.

**Causation**. Like *Hardieplank*, "[c]ausation is a key reason certification is inappropriate" because each class member will have to show what caused their claimed harm. 2018 WL 262826, at *18; *see also Melnick v. TAMKO Bldg. Prods. LLC*, 347 F.R.D. 79, 101 (D. Kan. 2024) (denying certification when "there are numerous reasons why putative class members' shingles may have failed").

Installation errors are a key cause of Plaintiffs' claimed performance issues. (*See* Ex. 69 (Welch Decl.) ¶ 14; *see also* Ex. 61 at HBF0610771.) Graybeal reinstalled her own grout using half a bag of Power Grout that sat open in her home for years.[71] She admitted the reinstallation went "poorly" and that she could not get the grout to "stay in the joints when I was putting it in."[72] De Broux complained to her contractor about various workmanship errors like broken tiles, failing to caulk around her tub, and improperly installing her shower head. (*See* Ex. 41.) Gougar and Lorbecki admit that their contractor failed to install a waterproof liner behind the tile in their shower.[73]

Most Plaintiffs could not confirm whether their contractors followed the Power Grout or Hardener application instructions.[74] The Andrees, Graybeal, and De Broux each

---

[71] *See* Ex. 18 (K. Graybeal Dep.) 129:14–24, 133:14–22, 134:20–135:2.

[72] *See* Ex. 18 (K. Graybeal Dep.) 86:17–87:5, 134:12–19.

[73] *See* Ex. 17 (M. J. Gougar Dep.) 78:18–79:5 ("Q. But there were certain spots that didn't have waterproofing? A. From what he said.").

[74] *See, e.g.*, Ex. 22 (J. Rouse Dep.) 53:21–24 ("Q. I'm just asking, you don't have any personal knowledge of whether the contractors mixed the grout correctly or not, right? A. No."); Ex. 9 (B. Andree Dep.) 152:22–153:5 ("I wasn't there when he mixed it."); Ex. 12

24

admitted that some Power Grout in their homes was not installed according to package directions.[75] H.B. Fuller's inspections revealed more installation errors, including contractors trying to pack grout between touching tiles (Rouses), grout that had not been packed down to the mortar (Graybeal), and grout installed in joints more than double Power Grout's maximum specified tolerance (Drouins). (*See* Ruhl Decl. ¶¶ 10–12.) The record shows that contractors and consumers often failed to follow instructions when installing Power Grout, causing the supposed performance issues. (*See* Jensen Decl. ¶¶ 14–17; Ex. 61; Ruhl Decl. ¶ 7.)

Thus, "[b]efore liability could be decided, individualized inquiries would be required into each class member's [Power Grout] to determine whether a defect caused the claimed deterioration, as opposed to installation error." *Hardieplank*, 2018 WL 262826, at *18. The evidence shows "multiple possible causes for Plaintiffs' alleged [grout] problems, and these individualized issues of causation will predominate over any alleged common issue of product defect." *Id.*

**Warranties**. Questions also abound over warranty-related issues. *See Hardieplank*, 2018 WL 262826 at *19 ("Each warranty claim file for each class member would need to

---

(K. De Broux Dep.) 138:22–139:1 (admitting she did not know whether contractor properly applied Hardener); *see also* Ex. 1.

[75] *See* Ex. 8 (A. Andree Dep.) 194:20–195:13 ("Did you know that your contractor had not mixed the entire bag? [Objection.] A. No. Q. Does that suggest to you the contractor may have made an error . . . ? [Objection.] A. Yes."); Ex. 18 (K. Graybeal Dep.) 116:3–8 (self-re-installed Power Grout but did not mix entire bags at once); Ex. 12 (K. De Broux Dep.) at 91:25–92:3 ("I have half a bag of the grout at my residence now, so I know that it wasn't all mixed.").

be analyzed to determine whether Hardie breached its warranty obligations."); *see also Daigle v. Ford Motor Co.*, 2012 WL 3113854, at *3 (D. Minn. July 31, 2012) ("Because the express warranty upon which Plaintiffs' rely is limited, whether this warranty was in effect for each class member requires individual proof[, thus] . . . this claim is not appropriate for class certification[.]").

While 10 households made Limited Warranty claims, and all 10 received Hardener (Ex. 1), they had different outcomes.[76] The Andrees and Graybeals refused to apply the Hardener.[77] The Whitenacks applied it some places but not others, while the Edwardses, Rouses, and Calamitas could not say where it had been applied.[78] Several Plaintiffs admit the Hardener fixed their perceived issues.[79]

Differences also surround whether the Limited Warranty excludes any person's claim. H.B. Fuller identified several households with workmanship issues that the Limited Warranty would exclude. (Ruhl Decl. ¶¶ 10–12; *see also* Ex. 45.) For three others, H.B. Fuller paid to replace the grout. (*See* Ex. 1.) Graybeal attempted to replace the grout herself.

---

[76] Several Plaintiffs waited at least a year to voice concerns about Power Grout, raising timeliness questions under the UCC. *See, e.g.*, Ex. 27 (K. Witczak Dep.) 149:2–25, 171:24–172:8, 182:6–9.

[77] *See* Ex. 18 (K. Graybeal Dep.) 219:15–220:1; Ex. 8 (A. Andree Dep.) 177:11–13.

[78] *See* Ex. 15 (L. Edwards Dep.) 152:12–153:18 (does not know where Hardener was installed); Ex. 25 (C. Whitenack Dep.) 76:7–77:6 (applied Hardener to shower walls but not floors, and none in kitchen); Ex. 22 (J. Rouse Dep.) 159:21–160:17 (does not know where Hardener was applied); Ex. 11 (R. Calamita Dep.) 219:5–220:24 (received Hardener for the bathroom but does not know where it was applied).

[79] *See, e.g.*, Ex. 19 (C. Lorbecki Dep.) 38:3–13 ("You could just see [the grout] smearing across the tile when you'd wash it; but after the hardener, it didn't do that.").

(*See* Ex. 1.) After their first contractor failed to properly install a waterproof liner in their shower, Gougar and Lorbecki bought more grout for a reinstallation but were unsure whether they bought Power Grout.[80] These scattershot approaches illustrate that "[e]ach warranty claim filed for each class member would need to be analyzed to determine whether [H.B. Fuller] breached its warranty obligations." *Hardieplank*, 2018 WL 262826, at *19.

### 2.    Individualized legal issues also predominate.

### a.    Plaintiffs lack standing to assert claims under the laws of states where they do not reside.

Plaintiffs are citizens of 10 states purporting to represent a "nationwide" group. But "[s]tanding 'is not dispensed in gross,' and 'plaintiffs must demonstrate standing for each claim that they press and for each form of relief they seek.'" *Rouse v. H.B. Fuller Co.*, 694 F. Supp. 3d 1149, 1156 (D. Minn. 2023) (quoting *TransUnion*, 594 U.S. at 431). Asserting a claim on behalf of a proposed class changes nothing. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Courts thus reject similar "nationwide" claims, as "[n]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Insulate SB,*

---

[80] *See* Ex. 17 (M. J. Gougar Dep.) 91:3–18.

*Inc. v. Adv. Finishing Sys., Inc.*, 2014 WL 943224, at \*11 (D. Minn. Mar. 11, 2014), *aff'd*,

797 F.3d 538 (8th Cir. 2015).[81]

Subclasses would not fix the issue because "there is no claim that governs a

nationwide class." *Carpenter v. PetSmart, Inc.*, 441 F. Supp. 3d 1028, 1039 (S.D. Cal.

2020). Plaintiffs lack standing to assert claims under the laws of any state other than their

own. *Insulate*, 2014 WL 943224, at \*11. Thus, at a minimum, the proposed nationwide

class allegations should be rejected.

### b.    State law variations also predominate.

Variations in state law also "swamp any common issues and defeat class

certification under Rule 23(b)(3)." *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir.

2019). Conflicts from as few as *four states* may preclude certification. *Webb v. Exxon

Mobil Corp.*, 856 F.3d 1150, 1157 (8th Cir. 2017); *see also In re Nat'l Hockey League

Players' Concussion Inj. Litig.*, 327 F.R.D. 245, 266 (D. Minn. 2018) (denying certification

when "individualized legal issues will substantially predominate over common legal

issues").

Class litigation would be a morass here. *See In re Bridgestone/Firestone, Inc.*, 288

F.3d 1012, 1015 (7th Cir. 2002) ("[S]tate laws about theories such as those presented by

our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or

---

[81] *See also, e.g.*, *Mollicone v. Universal Handicraft, Inc.*, 2017 WL 440257, at \*9 (C.D.
Cal. Jan. 30, 2017) ("[T]he majority of courts to consider this question have concluded that
when a representative plaintiff is lacking for a particular state, all claims based on that
state's laws are subject to dismissal."); *In re Terazosin Hydrochloride Antitrust Litig.*, 160
F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) (dismissing multiple counts where "it is clear that
no named plaintiff suffered an injury" in those states).

products-liability suits may not proceed as nationwide classes."). Plaintiffs' claims conflict in the 10 states where they live, with countless others if other jurisdictions are considered. While Plaintiffs have the burden to "provide an *extensive analysis* of state law variations to reveal whether these pose insuperable obstacles," *Sacred Heart Health Sys. v. Humana Mil. Healthcare Servs.*, 601 F.3d 1159, 1180 (11th Cir. 2010), the following examples show material differences in state law precluding certification.

*First*, the seven UDAP statutes Plaintiffs rely on[82] have varying elements and requirements that would "present a significant risk of jury confusion" and "create enormous challenges to trial management." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 985–86 (D. Minn. 2020), *aff'd*, 9 F.4th 981 (8th Cir. 2021); *accord Shoots v. iQor Holdings U.S. Inc.*, 325 F.R.D. 253, 269 (D. Minn. 2018) (denying certification of eight state sub-classes). The UDAP statutes differ on what constitutes a prohibited act; intent; reliance; limitations periods; and other things, like whether there is a required "public interest impact," whether a claim can be brought related to newly built homes, or whether there are individualized use-based exceptions.[83]

*Second*, state laws regarding warranty claims "vary in significant ways" that make class certification improper. *See Hardieplank*, 2018 WL 262826, at *19; *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 726 (5th Cir. 2007) (recognizing "numerous variations in the

---

[82] Plaintiffs propose seven state subclasses based on the UDAP statutes in Kentucky, Michigan, New Hampshire, North Carolina, Ohio, Pennsylvania, and Washington. (*See* TAC, Counts 6–15; *see also* n. 11 *supra*.)

[83] *See* Ex. 7.

substantive laws of express and implied warranty among the fifty-one jurisdictions").[84] The states where Plaintiffs reside differ over whether privity is required; what is required for an implied warranty claim; whether reliance is an element; whether pre-suit notice is required; and what constitutes timely and adequate notice.[85]

Third, "fraud cases often are unsuitable for class treatment." *St. Jude*, 522 F.3d at 838–40 (reversing class certification for common-law fraud claims); *see also Hardieplank*, 2018 WL 262826, at *20 (denying certification because court "would have to apply the laws and statues of limitations of fifty different states"). States differ on materiality of the alleged representations, reliance, and burden of proof.[86] They also differ as to scienter and statutes of limitations.[87] These assorted differences in what constitutes a fraud claim makes Plaintiffs' multi-state common-law fraud claims inappropriate for certification. *See Raymond v. Miller & Schroeder Municipals, Inc.*, 1983 WL 1419, at *3–4 (D. Minn. Jun. 29, 1983) (denying class certification involving common-law fraud claims in 26 states).

Fourth, Plaintiffs' negligence claims are ill-suited for class treatment. *See Baycol Prods. Litig.*, 218 F.R.D. at 208 (emphasizing variation among state negligence laws). The economic loss doctrine differs in each of Plaintiffs' states. *See Rouse v. H.B. Fuller Co.*,

---

[84] *See also In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018–19 (holding nationwide class for express warranty claim unmanageable because of differences in state law); *Forsher v. J.M. Smucker Co.*, 612 F. Supp. 3d 714, 726–28 (N.D. Ohio 2020) (denying class certification for class members in 44 states).

[85] *See* Exs. 2–3.

[86] *See* Ex. 6.

[87] *Id.*

694 F. Supp. 3d 1149, 1160–61 (D. Minn. Sept. 26, 2023); *Transp. Corp. of Am. v. Int'l Bus. Machines Corp.*, 30 F.3d 953, 957 (8th Cir. 1994) (explaining that in Minnesota, "damage to other components integrated into a single unit are not considered damage to other property for purposes of the economic loss doctrine"). Whether any Plaintiff can show the requisite damage to "other property" beyond the grout itself, as the economic loss doctrine requires, is an individualized issue. *See In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, 2017 WL 2540822, at \*10 (N.D. Ga. Jun. 9, 2017) ("Under the economic-loss rule, a cause of action does not arise where a product malfunctions or is defective and thereby causes damage only to the product itself. Thus, in order to assert a negligence claim, each class member will need to demonstrate some other form of damage. This inquiry will create numerous individualized questions."). [88]

Plaintiffs' states also employ different contributory fault schemes (comparative, modified comparative, contributory); have different rules for apportioning non-party fault; different statutes of limitations; and different economic-loss doctrines.[89] These differences

---

[88] Many Plaintiffs lack harm to "other property," or the alleged harm is limited to tiles chipped during repairs. (*See* Ex. 11 (R. Calamita Dep.) 228:22–229:8, 230:10–231:6, 251:10–252:18; Ex. 20 (D. Robb Dep.) 60:9–15; Ex. 10 (G. Calamita Dep.) 114:10–14, 237:15–238:1, 246:20–247:8; Ex. 26 (B. Witczak Dep.) 135:10–24; Ex. 12 (K. De Broux Dep.) 142:6–8 (as to hardener), 155:17–156:14 (as to some but not all installations); Ex. 18 (K. Graybeal Dep.) 130:11–131:3, 132:17–20, 252:22–254:24, 257:6–258:16 (some chipped tiles but otherwise no damage); Ex. 16 (N. Edwards Dep.) 263:1–265:3.) The Drouins claim the grout may have caused a one-time-only leak in their ceiling, but have no good support for the belief the leak was caused by the grout. (Ex. 13 (J. Drouin Dep.) 113:13–114:7; Ex. 14 (N. Drouin Dep.) 112:3–115:9.) They otherwise do not identify damage to other property. (Ex. 14 (N. Drouin Dep.) 122:9–12, 157:21–158:12.)

[89] *See* Ex. 4.

make it impossible to resolve Plaintiffs' negligence claims in a class trial. *See Norwood v. Raytheon Co.*, 237 F.R.D. 581, 597 (W.D. Tex. 2006) ("[S]ome states recognize a common law negligence claim, some states recognize a negligence claim regulated in certain aspects by statute, and some states have abolished the negligence claim in favor of a statutory products liability regime.").

*Fifth*, Plaintiffs' strict products liability claims involve "individualized inquiries," which "are inherently unsuitable for class-wide resolution." *Hummel v. Tamko Bldg. Prods., Inc.*, 303 F. Supp. 3d 1288, 1299 (M.D. Fla. 2017); *Norwood*, 237 F.R.D. at 597–98 ("Strict products liability law differs in American jurisdictions in several respects.").[90] Not all states even recognize strict products liability as a claim.[91] For those that do, the economic loss doctrine, comparative fault schemes, and limitations periods preclude uniform treatment.[92]

These variations—*among just the states where Plaintiffs reside*—preclude certification; adding 40 more states to the mix, as Plaintiffs intend, will only exacerbate

---

[90] *See also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 208 F.R.D. 625, 630 (W.D. Wash. 2002) ("[A] substantial number of courts have declined to certify putative products liability classes.") (collecting cases); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D. Cal. 1996) ("[M]ost courts have found that product liability cases typically present issues of liability and damages that are highly individual and therefore rarely qualify under the requirements of Rule 23(a) and (b)."); *Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 620 (S.D. Ohio 1996) (decertifying class alleging product defect in part because "the parties, the Court and the jury would need to simultaneously apply the varying and inconsistent laws of more than 40 states concerning what constitutes a product defect under strict products liability").

[91] *See* Ex. 5.

[92] *Id.*

these problems. *See Johannessohn*, 450 F. Supp. 3d at 986 (recognizing that "class treatment is not appropriate under the laws of so many different states"). Given the inherent unmanageability raised by Plaintiffs' varying claims, certification should be denied.

## C.    Plaintiffs Are Atypical.

A "proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation." *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999); *Hardieplank*, 2018 WL 262826, at *13 (ruling that plaintiffs were atypical because they were "subject to unique defenses," including that "they were exposed to different representations and, often, were not exposed to the alleged misrepresentations . . . at all"). "[T]he presence of even an arguable defense peculiar to the proposed representative may destroy typicality of the class." *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 329 (D. Minn. 2005).

Plaintiffs' individual claims are vulnerable to dispositive defenses, presenting additional barriers to certification under Rules 23(a)(3) and (4). Gina Calamita admitted no property damage other than to the grout itself (economic loss doctrine);[93] Gougar and Lorbecki admitted that their contractor's failure to install the waterproof barrier in their shower led to water damage (causation);[94] De Broux admitted no reliance on any H.B. Fuller representation in choosing Power Grout and did not even know that Power Grout

---

[93] *See* Ex. 10 (G. Calamita Dep.) 246:20–247:8 ("Q. Are you contending that any of the property in your home has been damaged by the grout? [Objection.] A: I don't see—other than bleeding and the issues with the grout itself all—any of the property around that, I can't see anything.").

[94] *See* Ex. 17 (M. J. Gougar Dep.) 78:18–79:5.

was being installed (lack of reliance);[95] the Drouins chose Power Grout primarily based on the color (lack of materiality);[96] and the Whitenacks bought Power Grout from Louisville Tile, not H.B. Fuller (lack of privity).[97] These unique defenses destroy typicality, and certification should be denied for this additional reason.

## D.    Plaintiffs Cannot Establish Superiority.

Plaintiffs are also unable to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

*First*, "this is not a negative value suit." *Hardieplank*, 2018 WL 262826, at *19; *see also Baycol*, 218 F.R.D. at 210 ("The most compelling rationale for finding superiority in a class action is whether the action is a negative value suit."). Class actions are meant for scenarios "when the class members' claims are generally small and unlikely to be pursued individually." *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 605 (8th Cir. 2020) (en banc). Plaintiffs claim tens or hundreds of thousands of dollars in damages.[98] Putative class members have every incentive to pursue individual claims; a class action is unnecessary.

---

[95] *See* Ex. 12 (K. De Broux Dep.) 88:3–9.

[96] *See* Ex. 14 (N. Drouin Dep.) 53:6–19 ("[M]y primary concern was . . . the color.").

[97] *See* Ex. 25 (C. Whitenack Dep.) 43:5–6; *Mosley v. EzriCare LLC*, 2024 WL 1342615, at *13 (E.D. Ky. Mar. 29, 2024) (explaining that Kentucky UDAP requires a "direct buyer-seller relationship").

[98] *See* Ex. 9 (B. Andree Dep.) 229:10–13, 230:17–19 (quoting repair cost at $18,945); Ex. 18 (K. Graybeal Dep.) 168:16–17, 251:21–252:2 (claiming damages were likely "hundreds of thousands of dollars").

*Second*, variations in the laws applicable to Plaintiffs' claims would make jury instructions "unwieldy and complex." *Hardieplank*, 2018 WL 262826, at *19; *see also Shoots*, 325 F.R.D. at 269 ("[T]he Court finds that because the applicable law of the eight states varies, a class action is not the superior method for resolving Plaintiffs' state law claims.").

*Third*, this case involves two different and unique products—Power Grout and the Hardener—and the class definition puts at issue seven versions of Power Grout, each with different formulas and characteristics. H.B. Fuller's representations and product packaging and literature also changed repeatedly over the class period and even vary by bag size. Requiring a jury to track all these differences while applying the laws of several jurisdictions "would present a significant risk of jury confusion and would create enormous challenges to trial management." *Johannessohn*, 9 F.4th at 986 (holding class action not superior where "proposed classes will require application of the laws of four different states to forty-three different vehicle configurations, including at least four different engines, with changing exhaust standards through the years, and various attempts by Polaris to remedy the problems").

*Fourth*, H.B. Fuller's warranty-claims process provides consumers with adequate relief. Thus, "putative class members also have the option of bringing warranty claims directly to [H.B. Fuller]," so a class action is "not the superior method for the putative class members to resolve their potential claims." *Runyon*, 2017 WL 5988019, at *4; *see also Daigle*, 2012 WL 3113854, at *5 (ruling that class action was not superior because Ford's voluntary recall procedure provided relief). The Limited Warranty provides consumers

straightforward relief. They simply need to send H.B. Fuller proof of purchase and describe their claim in writing. (*See* Ex. 45.) H.B. Fuller has been responsive with remedies— including reimbursing Plaintiffs for repairs when appropriate. (*See* Ex. 1.) Under these facts, a class action is not superior, and certification should be denied.

### E.    Plaintiffs Cannot Certify a Class Under Rule 23(b)(2).

Plaintiffs also improperly seek to certify a Rule 23(b)(2) injunctive-relief class. Plaintiffs' claims raise "a significant number of individualized factual and legal determinations," which is fatal to a (b)(2) certification. *See Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1093 (8th Cir. 2021) (affirming denial of certification).[99]

Plaintiffs also cannot certify a Rule 23(b)(2) class because their "focus is clearly on obtaining monetary relief." *Amos v. Geico Corp.*, 2008 WL 4425370, at *14 (D. Minn. Sept. 24, 2008) (denying certification).[100] Plaintiffs are seeking damages to replace or repair the grout in their homes,[101] and money damages would compensate their "injuries," even if proven.

Finally, H.B. Fuller sold its Flooring Division to a non-party in December 2024, and thus no longer owns, manufactures, or sells either of the products at issue. (*See* ECF No.

---

[99] *See also Grovatt v. St. Jude Med., Inc.*, 425 F.3d 1116, 1121–22 (8th Cir. 2005) (reversing Rule 23(b)(2) certification because plaintiffs' claims were individualized and lacked the "cohesiveness" required for a 23(b)(2) class).

[100] *Accord Avritt v. Reliastar Life Ins.*, 2009 WL 455808, at *3 (D. Minn. Feb. 23, 2009), *aff'd*, 615 F.3d 1023 (8th Cir. 2010) (denying Rule 23(b)(2) certification because monetary claims predominated).

[101] *See, e.g.*, Ex. 23 (L. Rouse Dep.) 292:1–4; Ex. 14 (N. Drouin Dep.) 12:1–12.

377 at 4–5 (explaining sale of Flooring Division).) As Plaintiffs have admitted,[102] their injunctive relief claims against H.B. Fuller are moot. *See Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 354 (8th Cir. 1998) ("A claim for injunctive relief may become moot if challenged conduct permanently ceases."). Plaintiffs' claims thus afford no basis for a Rule 23(b)(2) class.

## V.   CONCLUSION

Plaintiffs cannot satisfy Rule 23. Any claims Plaintiffs have left after working through H.B. Fuller's warranty process would best be maintained as individual actions. H.B. Fuller thus asks the Court to grant this Motion and deny class certification.

---

[102] *See* ECF No. 346 at 1–2 ("Defendants' divestiture of the product at issue in this case has created a situation in which Plaintiffs are no longer suing the parties who are currently responsible for the manufacturing, marketing, and sale of Power Grout . . . . [M]uch of the injunctive relief Plaintiffs seek would now be meaningless if it were awarded . . . .").

Dated: April 9, 2025

*/s/ Lorie S. Gildea*
Lorie S. Gildea (#0233961)
Laura R. Hammargren (#0389276)
**GREENBERG TRAURIG, LLP**
90 S. 7th St., Suite 3500
Minneapolis, MN 55402
Phone: (612) 259-9700
Fax: (612) 677-3101
Lorie.Gildea@gtlaw.com
Laura.Hammargren@gtlaw.com

Robert J. Herrington (admitted pro hac vice)
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Phone: (310) 586-7700
Fax: (310) 586-7800
Robert.Herrington@gtlaw.com

Christopher S. Dodrill (admitted pro hac vice)
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Phone: (214) 665-3600
Fax: (214) 665-3601
Christopher.Dodrill@gtlaw.com

Todd A. Noteboom (#0240047)
William D. Thomson (#0396743)
Andrew P. Leiendecker (#0399107)
Zachary J. Wright (#0402945)
**Stinson LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
todd.noteboom@stinson.com
william.thomson@stinson.com
andrew.leiendecker@stinson.com
zachary.wright@stinson.com

38

Jeremy A. Root (admitted pro hac vice)
**Stinson LLP**
230 W. McCarty Street
Jefferson City, MO 65101
Telephone: (573) 636-6263
jeremy.root@stinson.com

*Attorneys for Defendants H.B. Fuller Company and H.B. Fuller Construction Products, Inc.*